## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL L LABARRE,

              Plaintiff

    v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

              Defendant

CIVIL ACTION NO. 1:14-CV-02484

(MEHALCHICK, M.J.)

### MEMORANDUM OPINION

This is an action brought under Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Darrell L. LaBarre's claims for disability insurance benefits and supplemental security income under the Social Security Act. This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 16; Doc. 18). For the reasons expressed herein, the Commissioner's decision shall be **AFFIRMED**, and Mr. LaBarre's request for the award of benefits shall be **DENIED**.

### I.    PROCEDURAL HISTORY

On April 9, 2009, Darrell LaBarre protectively filed applications for benefits alleging that he became disabled on June 1, 2007, due to Bipolar disorder, circulation problems in his legs, manic depression, anxiety, loss of sleep, and loss of concentration. Mr. LaBarre alleges that his impairments affect his ability to remember and concentrate. (Admin. Tr. 251, Doc. 6-6, at 18).

Mr. LaBarre testified that he last worked in November 2007. Mr. LaBarre was prescribed Lithium and Effexor, and stated that both of these medications "give him the shakes," in his arms and legs. (Admin. Tr. 74, Doc. 6-2, at 75); (Admin. Tr. 107, Doc. 6-2, at 108). He reported that he was placed on light duty between June 2007 and November 2007 because these medication side-effects were interfering with his job performance, and because his employer was concerned that they increased the likelihood that Mr. LaBarre would be involved in a workplace accident. (Admin. Tr. 70-71, Doc. 6-2, at 71-72). Mr. LaBarre left his position in November 2007 when he was taken off light duty.

Mr. LaBarre testified that, since he has stopped working, some days he gets so depressed that he does not leave his bed. He experiences these "bad days" approximately three quarters of each month. (Admin. Tr. 79, Doc. 6-2, at 80). He admitted that he gets a lot of suicidal thoughts, but does not act on them. (Admin. Tr. 78, Doc. 6-2, at 79); (Admin. Tr. 101, Doc. 6-2, at 102). Mr. LaBarre's father – who lives with and cares for Mr. LaBarre – testified that if his son has two good days a week, it is a good week. (Admin. Tr. 86, Doc. 6-2, at 87). Mr. LaBarre's father also reported that since Mr. LaBarre had stopped working he had difficulty putting his thoughts together and expressing them. (Admin. Tr. 87, Doc. 6-2, at 88).

Despite his impairments Mr. LaBarre is able to prepare his own meals (when necessary), do laundry, clean, mow the lawn, shop in stores, watch television, go hunting, and spend time with family on holidays and birthdays. In July 2009 Mr. LaBarre reported that he is able to drive a car, but only on days when he does not experience his medication side-effects. (Admin Tr. 249, Doc. 6-6, at 16).

Mr. LaBarre's applications were initially denied on December 31, 2009, and he timely requested a hearing before an administrative law judge ("ALJ"). On February 28, 2011, Mr.

LaBarre appeared with his attorney before ALJ Edward L. Brady. Impartial vocational expert Carmine Abraham ("VE Abraham") also appeared and testified during the 2011 administrative hearing. On March 11, 2011, the ALJ denied Mr. LaBarre's applications for disability insurance benefits and supplemental security income, finding that, although he was not capable of returning to his past work as a maintenance repairman, he was capable of engaging in other work. Mr. LaBarre requested administrative review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review. The Appeals Council granted Mr. LaBarre's request for review, vacated the ALJ's March 11, 2011 decision, remanded Mr. LaBarre's case back to the ALJ, and directed the ALJ to: give further consideration to Mr. LaBarre's maximum RFC; resolve some irregularities in the vocational expert testimony; evaluate new evidence from Dr. Gross concerning the effectiveness of Mr. LaBarre's medications.

On March 19, 2013, Mr. LaBarre appeared with his attorney at a second administrative hearing before the same ALJ. VE Abraham returned to testify at the 2013 administrative hearing. On May 13, 2013, the ALJ denied Mr. LaBarre's applications for disability insurance benefits and supplemental security income, finding once again that although he was not capable of returning to his past work, Mr. LaBarre was capable of engaging in other work. Mr. LaBarre requested administrative review of the ALJ's second decision by the Appeals Council. The Appeals Council denied Mr. LaBarre's request on October 31, 2014. This makes the ALJ's May 13, 2013, decision the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

Mr. LaBarre appealed the Commissioner's final decision by filing the complaint in this action on December 30, 2014. (Doc. 1). In his complaint, Mr. LaBarre alleged that the

Commissioner's final decision was contrary to the law and not supported by substantial evidence. (Doc. 1 ¶¶ 17-18). As relief, Mr. LaBarre requests that this Court modify the Commissioner's final decision and grant Mr. LaBarre's applications for benefits. (Doc. 1, at 4). The Commissioner filed her answer to Mr. LaBarre's complaint on March 10, 2015. (Doc. 5). In her answer, the Commissioner maintains that her final decision is in accordance with the law and regulations, and that the Commissioner's findings of fact are supported by substantial evidence. (Doc. 5 ¶ 7). The Commissioner requests that Mr. LaBarre's Complaint be dismissed. (Doc. 5, at 4). Together with her answer, the Commissioner filed a certified transcript of the administrative record in Mr. LaBarre's case. (Doc. 6). This matter is now fully briefed by the parties and ripe for decision. (Doc. 9; Doc. 14).

## II.   STANDARD OF REVIEW

To receive benefits under Title II or Title XVI of the Social Security Act, the claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). To satisfy this requirement, the claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant number in the national economy. 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B). In addition, to be eligible to receive benefits under Title II of the Social Security Act, a claimant must be insured for disability insurance benefits. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131.

In evaluating the question of whether a claimant is under a disability as it is defined in the Social Security Act, the Commissioner follows a five-step sequential evaluation process.

C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing of Impairments"); (4) whether the claimant is able to do his past relevant work, considering his current residual functional capacity ("RFC");[1] and, (5) whether the claimant is able to do any other work that exists in significant numbers in the national economy, considering his current RFC, age, education, and work experience. *Id.* The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him from doing his past relevant work. 20 C.F.R. § 404.1512(a); 20 C.F.R. § 416.912(a). Once the claimant has established at step four that he cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform that are consistent with his RFC, age, education, and past work experience. 20 C.F.R. § 404.1512(f); 20 C.F.R. § 416.912(f).

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference); *Johnson v. Comm'r of Soc. Sec.,*

---

[1] A claimant's RFC is the most a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1); *see also Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000). Before the ALJ goes from step three to step four, he or she assesses the claimant's RFC. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4). The RFC is used at step four and step five to evaluate the claimant's case.

529 F.3d 198, 200(3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536(M.D.Pa. 2012).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance

of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A

single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or

fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.

1993). But in an adequately developed factual record, substantial evidence may be "something

less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions

from the evidence does not prevent [the ALJ's decision] from being supported by substantial

evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the

Commissioner's decision is supported by substantial evidence the court must scrutinize the

record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question

before this Court, therefore, is not whether Mr. LaBarre is disabled, but whether the

Commissioner's finding that he is not disabled is supported by substantial evidence and was

reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-

02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's

errors of law denote a lack of substantial evidence.")(alterations omitted); *Burton v. Schweiker*,

512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim

requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675,

678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); *Ficca*, 901

F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

### III.   THE ALJ'S DECISION

In his May 13, 2013, decision, the ALJ determined that Mr. LaBarre last met the insured status requirement of Title II of the Social Security Act on December 31, 2012.[2] (Admin. Tr. 23, Doc. 6-2, at 24). At step one of the five-step process, the ALJ determined that Mr. LaBarre did not engage in substantial gainful activity between his alleged onset date of June 1, 2007, and the date the ALJ denied his claims.[3] (Admin. Tr. 23, Doc. 6-2, at 24). At step two, the ALJ determined that Mr. LaBarre had the following medically determinable severe impairments: bipolar disorder, learning disorder, and chronic dermatitis. (Admin. Tr. 24, Doc. 6-2, at 25). At step three, the ALJ determined that Mr. LaBarre did not have an impairment, or combination of impairments, that met or medically equaled the severity of any one of the listed impairments in the Listing of Impairments. (Admin. Tr. 24, Doc. 6-2, at 25).

Prior to step four, the ALJ determined Mr. Labarre's RFC based on the evidence of record, including: the claimant's testimony; the findings and opinions of treating, nontreating, and nonexamining medical sources; and the objective medical evidence of record. *See* 20 C.F.R. § 404.1502, 20 C.F.R. § 416.902 (defining treating, nontreating, and nonexamining medical

---

[2] The relevant period for Mr. LaBarre's Title II application spans from June 1, 2007, to December 31, 2012. The relevant period for Mr. LaBarre's Title XVI application, however, spans from June 1, 2007, to May 13, 2013.

[3] The ALJ noted that Mr. LaBarre worked in a limited capacity between June 2007 and November 2007, and that earnings records were unclear whether Mr. LaBarre's income after June 2007 rose to the level of substantial gainful activity. (Admin. Tr. 23, Doc. 6-2, at 24); *see* 20 C.F.R. § 404.1510, 20 C.F.R. § 416910 (defining substantial gainful activity); *see also* 20 C.F.R. § 404.1571 *et. seq.*; 20 C.F.R. § 416.971 *et seq.* Earnings records from 2008, however, were clear that Mr. LaBarre's earnings did not rise to the level of substantial gainful activity.

sources). The ALJ determined that Mr. LaBarre retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 20 C.F.R. 416.967(b), except:

> the claimant can lift and carry twenty pounds occasionally and ten pounds frequently while sitting, standing, walking six hours each in an eight-hour day while avoiding heights and moving machinery at jobs which are simple and routine described as unskilled with no more than an SVP of two. The claimant should have jobs which require no production rate/pace requirements with no interaction with the public and occasional interaction with co-workers and supervisors.

(Admin. Tr. 25, Doc. 6-2, at 26).

Pursuant to 20 C.F.R. § 404.1529, 20 C.F.R. § 416.929, and Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, the ALJ considered Mr. LaBarre's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (Admin. Tr. 32, Doc. 6-2, at 33). The ALJ explained that the objective treatment notes from Mr. LaBarre's treating psychiatrist were relatively normal and did not document the presence of symptoms at the level of severity alleged, that more recent treatment notes were similarly unremarkable, and that Mr. LaBarre continued to do fairly well even with limited outpatient care. The ALJ also observed that, with the exception of an occasional dosage adjustments, Mr. LaBarre has been taking the same medications while under the care of Dr. Gross (onset date through February 2012). *See* SSR 96-7p, 1996 WL 374186 at *7 ("Persistent attempts by the individual to obtain relied of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms."). Mr. LaBarre began seeing a new doctor after he transitioned from private insurance to a medical ACCESS card. He stopped seeing him five

months later after that doctor attempted to take Mr. LaBarre off several medications without substituting new medications.

Pursuant to 20 C.F.R. § 404.1527, 20 C.F.R. § 416.927, SSR 96-2p, 1996 WL 374188, SSR 96-5p, 1996 WL 374183, and SSR 96-6p, 1996 WL 374180, the ALJ considered the medical opinions of: nontreating psychologist Tiffany Griffiths ("Dr. Griffiths"), (Admin. Tr. 337-45, Doc. 6-7, at 54-62); nonexamining psychologist Ira Gensemer ("Dr. Gensemer"), (Admin. Tr. 346-61, Doc. 6-7, at 63-78); nontreating physician Sethuraman Muthiah ("Dr. Muthiah"), (Admin. Tr. 362-69, Doc. 6-7, at 79-86); and, treating psychiatrist Paul Gross ("Dr. Gross"), (Admin. Tr. 431-440, Doc. 6-8, at 54-63).

On October 12, 2009, Dr. Griffiths evaluated Mr. LaBarre in connection with his applications for benefits. On mental status examination, Dr. Griffiths observed that Mr. LaBarre appeared alert and interactive, was dress and groomed appropriately, exhibited no behavioral oddities (psychomotor agitation or retardation), and demonstrated a cooperative attitude. Mr. LaBarre's mood was neutral, his affect was blunted, and his speech was marked by an expressive deficit, but his intelligence appeared to be average. Dr. Griffiths also assessed that Mr. LaBarre's concentration was poor based on poor performance on the serial 7s task and marginal performance on the Digit Span task. Additionally, he assessed that Mr. LaBarre had poor short-term memory. Dr. Griffiths reported the diagnostic impression of Bipolar disorder with a history of psychotic features, and learning disability not otherwise specified, and a

Global Assessment of Functioning ("GAF") score of 52.[4] In her accompanying medical source statement, Dr. Griffiths assessed that Mr. LaBarre would be moderately limited in the following activities: understanding and remembering detailed instructions; carrying out detailed instructions; interacting appropriately with the public; interacting appropriately with supervisors; interacting appropriately with co-workers; and, responding appropriately to work pressures. Dr. Griffiths assessed that Mr. LaBarre would be slightly limited in the following activities: understanding and remembering short, simple instructions; carrying out short, simple instructions; and responding appropriately to changes in a routine work setting.

-------------------

[4] A GAF score is a numerical summary of a clinician's judgment of an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health on a scale of one hundred. *See Diagnostic and Statistical Manual of Mental Disorders*, 32-35(4th ed. text rev. 2000) (hereinafter "DSM-IV"). **Error! Main Document Only.**A GAF score is set within a particular range if either the symptom severity *or* the level of functioning falls within that range. *Id.* "[T]he Social Security Administration has explicitly declined to endorse the use of the GAF scale because its scores do not have a direct correlation to the disability requirements and standards of the Act." *Coy v. Astrue*, No. 08-1372, 2009 WL 2043491 at *14 (W.D.Pa. Jul. 8, 2009)(*citing* 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).

　　**Error! Main Document Only.**A score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. DSM-IV at 32-35. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* A GAF score of 51-60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61-70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. *Id.* A GAF score of 71-80 represents transient symptoms, if present, and expectable reactions to psychosocial stressors or no more than slight impairment in social, occupational, or school functioning. *Id.*

On October 30, 2009, Dr. Gensemer completed a psychiatric review technique ("PRT") form and mental RFC assessment as part of evaluation of Mr. LaBarre's claims at the initial level of administrative review. Dr. Gensemer opined that Mr. LaBarre had medically determinable mental impairments that did not precisely satisfy the diagnostic criteria of §12.04 and §12.09 of the Listing of Impairments. He also assessed that Mr. LaBarre's mental impairments resulted in a mild restriction of activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. In his RFC assessment, Dr. Gensemer opined that Mr. LaBarre could: perform simple, routine, repetitive work in a stable environment; follow simple job instructions (i.e., one and two step tasks); make simple decisions; carry out very simple and short job instructions; function in production oriented jobs requiring little independent decision-making; and perform repetitive work activities without constant supervision. Dr. Gensemer also noted that Mr. LaBarre had some limitation dealing with work stressors and public contact.

On December 9, 2009, Dr. Muthiah examined Mr. LaBarre in connection with his applications for benefits. On physical examination, Dr. Muthiah observed that Mr. LaBarre had a tremor in both hands, and that he had minimal discoloration of the lower left extremity consistent with chronic dermatitis. Dr. Muthiah reported the diagnostic impression of bipolar disorder (with predominant depressive features and psychotic features), and chronic dermatitis of the lower left extremity. In his accompanying physical RFC assessment, Dr. Muthiah opined that Mr. LaBarre could: lift up to twenty-five pounds and carry up to twenty pounds frequently; stand, walk, or sit without limitation; engage in postural activities without limitation; and work

in any environment where he would not be exposed to unprotected heights or moving machinery.

On May 6, 2011, Dr. Gross authored a narrative opinion about Mr. LaBarre's symptoms. In his letter, Dr. Gross opined that Mr. LaBarre would be unable to work for the foreseeable future due to the severity of the symptoms resulting from Bipolar disorder. Dr. Gross stated that Mr. LaBarre's symptoms included: poor concentration; forgetfulness; difficulty coping with average stressors; low energy and stamina several days per week; and, poor sleep. Dr. Gross also reported that Mr. LaBarre's medications cause the following intolerable side-effects: nausea, headaches, tremors, and muscle jerks. In an accompanying Psychiatric/Psychological Impairment Questionnaire ("Questionnaire") Dr. Gross reported that he had been treating Mr. LaBarre monthly since July 2005 for Bipolar disorder. Dr. Gross noted that Mr. LaBarre's highest GAF score in the past year was 55, and his current GAF score was 40. Dr. Gross reported that his diagnosis was supported by the following clinical findings: poor memory; appetite disturbance with weight change; sleep disturbance; mood disturbance; loss of intellectual ability (15 IQ points or more); recurrent panic attacks; anhedonia or pervasive loss of interests; psychomotor agitation or retardation; feelings of guilt/worthlessness; difficulty thinking or concentrating; suicidal ideation or attempts; oddities of thought, perception, speech or behavior; time or place disorientation; social withdrawal or isolation; blunt, flat or inappropriate affect; decreased energy; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and, hostility and irritability. Dr. Gross assessed that, over a normal workday and workweek Mr. LaBarre would be markedly limited in the following activities: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for

extended periods; performing activities within a schedule, maintaining attendance, and being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; making simple work-related decisions; completing a normal workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; traveling to unfamiliar places or using public transportation; and setting realistic goals or making plans independently. Dr. Gross assessed that, over a normal workday and workweek Mr. LaBarre would be moderately limited in the following activities: remembering locations and work-like procedures; understanding and remembering one or two step instructions; and, asking simple questions or requesting assistance. Dr. Gross assessed that, over a normal workday and workweek Mr. LaBarre would be mildly limited in the following activities: carrying out simple one or two step instructions; sustaining an ordinary routine without supervision; interacting appropriately with the general public; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and, being aware of normal hazards and taking appropriate precautions.

The ALJ's determinations at steps four and five of the sequential evaluation process were guided by the testimony of VE Abraham. The VE testified that Mr. LaBarre's past relevant work included work as a maintenance repairman (DOT #899.381-010) was medium and skilled with an SVP of seven. (Admin. Tr. 109, Doc. 6-2, at 110); *see also* 20 C.F.R. § 404.1567(c) and 20 C.F.R. § 416.967(c)(defining medium work); 20 C.F.R. § 404.1568(c) and 20 C.F.R. § 416.968(c)(defining skilled work); SSR 00-4p, 2000 WL 1898704 at *3 (discussing SVP). The

VE also testified that, considering the ALJ's RFC assessment, Mr. LaBarre could not engage in his past relevant work. (Admin. Tr. 110, Doc. 6-2, at 111). Last, the VE testified that an individual with the same RFC, age, education, and work experience could engage in "other work" including the occupations of: inspector/packager (e.g., DOT #559.687-014); inspector (e.g., DOT #920.685-026); and, cleaner (e.g., DOT #323.687-014).

Based on the VE's testimony, the ALJ found that Mr. LaBarre would be unable to engage in any of his past relevant work. (Admin. Tr. 34, Doc. 6-2, at 35). He also concluded that Mr. LaBarre would be capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Admin. Tr. 35, Doc. 6-2, at 36).

## IV.   ANALYSIS

Mr. LaBarre asserts that the ALJ's decision denying his claims should be vacated because the ALJ's RFC assessment is not supported by substantial evidence. (Doc. 9, at 18). Specifically, Mr. LaBarre alleges that he does not have the mental capacity to perform any type of sustained work activity. *Id.* Specifically, Mr. LaBarre asserts that the ALJ erred in weighing the medical evidence of record by failing to credit the 2011 medical opinion of Dr. Gross, and that the ALJ improperly discounted the credibility of Mr. LaBarre's testimony.

### A.   WHETHER THE ALJ ERRED IN WEIGHING THE MEDICAL EVIDENCE

Mr. LaBarre alleges that the ALJ erred by failing to properly weigh the medical opinion evidence in his 2013 decision denying Mr. LaBarre's claims. Specifically, Mr. LaBarre argues that the ALJ improperly discounted the opinions by treating psychiatrist, Dr. Gross in favor of opinions submitted by two nontreating sources that the ALJ found to be more consistent with the longitudinal medical record.

The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2), 20 C.F.R. § 416.927(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(c), 20 C.F.R. § 416.927(c).

In deciding what weight to accord to competing medical opinions, the ALJ is guided by factors outlined in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. See 20 C.F.R. § 404.1527(c)(2), 20 C.F.R. § 416.927(c)(2)("Generally, we give more weight to opinions from your treating sources . . . ."). Under some circumstances, the medical opinion of a treating source may be entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2), 20 C.F.R. § 416.927(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which

the source presented relevant evidence to support his or her medical opinion, and the extent to

which the basis for the source's conclusions were explained; the extent to which the source's

opinion is consistent with the record as a whole; whether the source is a specialist; and, any

other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c), 20 C.F.R. § 416.927(c).

Furthermore, it is beyond dispute that, in a social security disability cases, the ALJ's

decision must be accompanied by "a clear and satisfactory explication of the basis on which it

rests." *Cotter*, 642 F.2d at 704-05. This principle applies with particular force to the opinion of a

treating physician. *See* 20 C.F.R. § 404.1527(c)(2), 20 C.F.R. § 416.927(c)(2)("We will always

give good reasons in our notice of determination or decision for the weight we give your

treating source's opinion."). "Where a conflict in the evidence exists, the ALJ may choose

whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer v.*

*Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)(*quoting Mason*, 994 F.2d at 1066); *see also Morales v. Apfel*,

225 F.3d 310, 317 (3d Cir. 2000).

In his decision the ALJ explained that he accorded "little" weight to the medical opinion

of Dr. Gross because they were:

> not supported by the evidence including his own mental status examinations.
> Those evaluations are positive for a blunted affect and dysphoric mood only. The
> claimant has had no inpatient hospitalizations since his alleged onset date, has
> had unlimited medication, and, indeed, very limited outpatient care. Dr. Gross
> provided several limitations in his report which are not reflected anywhere in the
> record and are inconsistent with the claimant's own testimony. One would
> expect that with the significant symptomatology noted by Dr. Gross in his
> statement and questionnaire that he would recommend more intensive
> outpatient or perhaps inpatient treatment than the claimant has undergone
> (Exhibits 11F and 12F).

(Admin. Tr. 33, Doc. 6-2, at 34). Instead, the ALJ accorded "significant" weight to the medical

opinions of Dr. Griffiths, a nontreating source who examined Mr. LaBarre on one occasion in

October 2009, and "great" weight to a PRT form and mental RFC assessment prepared by Dr. Gensemer, a source who never examined Mr. LaBarre. (Admin. Tr. 33-34, Doc. 6-2, at 34-35). Mr. LaBarre argues that the ALJ impermissibly rejected Dr. Gross' opinions based on the ALJ's own lay evaluation of what course of care would have been appropriate for an individual with the extreme symptomatology alleged by Mr. LaBarre. In support of his argument, he relies on the Third Circuit case *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000).

In *Morales*, the Court found that the ALJ had ignored the "ultimate conclusions and medical symptomatology" supporting a treating source medical opinion and drew his own conclusions based solely on his own credibility determination and a nontreating source's note that the claimant appeared to be malingering. *Id.* at 318. Our review of this case reveals that, unlike in *Morales*, the ALJ also relied on the lack of documented symptoms on mental status examination in Dr. Gross' treatment records, and the inconsistency between the clinical findings and symptoms Dr. Gross reported in his questionnaire when compared to his longitudinal treatment records to discount Dr. Gross' opinions. While the Court agrees with Mr. LaBarre that the ALJ did inappropriately interject his own lay assessment when he speculated that if Mr. LaBarre was a limited as Dr. Gross assessed, the doctor would have recommended a more intensive course of treatment than was prescribed, *see e.g.*, *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015)(finding that and ALJ "went far outside the record when he said that if Voigt were a psychologically afflicted as [his treating source] thought, he 'would be institutionalized and/or have frequent inpatient treatment' – a medical conjecture that the [ALJ] was not competent to make . . . ."), this is not the only evidence he cited when he discounted Dr. Gross' opinions.

As noted by the ALJ in his written decision, Dr. Gross identified a laundry list of "clinical findings" on a check-box portion of his questionnaire that are simply not substantiated by his own treatment notes. (Admin. Tr. 33, Doc. 6-2, at 34)("The records do not document the numerous symptoms alleged by Dr. Gross in his statements that the claimant is disabled."). Furthermore, Dr. Gross did not provide any explanation clarifying this discrepancy in the questionnaire itself or in his May 2011 letter. The ALJ accurately characterized Dr. Gross' treatment notes as "generally illegible." (Admin. Tr. 36, Doc. 6-2, at 27). The ALJ also noted in his summary of the objective medical evidence that the mental status examinations by the Carbon-Monroe-Pike MH/MR conducted in Mr. LaBarre's home between March 2012 and October 2012 were unremarkable. (Admin. Tr. 33, Doc. 6-2, at 34); *see also* (Admin Tr. 470, 472, 474, 476, 478, 480, Doc. 6-8, at 93, 95, 97, 99, 101, 103)(noting appropriate appearance, no abnormal movements, appropriate mood/affect, no depression or euphoria observed, good memory, good attention, good judgment, good insight, and average intelligence in May 2012, June 2012, July 2012, September 2012, and October 2012). As such, the Court finds that the ALJ's ultimate decision to discount Dr. Gross' opinion is based on medical evidence, rather than the ALJ's own speculation.

Similarly, the Court finds that the ALJ did not err by according the opinions of Dr. Griffiths and Dr. Gensemer "significant" and "great" weight. Although Mr. LaBarre accurately notes that he did experience an improvement in his overall level of functioning around the time when both of these assessments were done, the Court disagrees with his characterization of this period of improvement as "short-lived." In July 2009, Mr. LaBarre told Dr. Gross that he had little energy. (Admin. Tr. 416, Doc. 6-8, at 39). On examination, Dr. Gross noted that Mr. LaBarre exhibited a blunted affect and dysphoric mood, and assigned Mr. LaBarre a current

GAF score of 40. Dr. Gross also adjusted Mr. LaBarre's dosage of Effexor. When Mr. LaBarre returned to Dr. Gross in September 2009, Mr. LaBarre reported that he still had depressive symptoms. (Admin. Tr. 417, Doc. 6-8, at 40). Dr. Gross noted that Mr. LaBarre exhibited a blunted affect and dysphoric mood, but assessed that Mr. LaBarre's GAF score had improved significantly and was now a 60. Mr. LaBarre's GAF scores remained consistently at 60 until December 2010. [5] Dr. Gross' clinical notes provide little insight into Mr. LaBarre's condition at the time, as they are extremely brief and nearly illegible. He did note on several occasions, however, that Mr. LaBarre was completely without any observed symptoms in the check-box portion of his notes. (Admin. Tr. 418, 420, 421, 422, 424, 426, 427, 428, Doc. 6-8, at 41, 43, 44, 45, 47, 49, 50)(noting no observable symptoms in November 2009, March 2010, April 2010, May 2010, July 2010, October 2010, November 2010, and December 2010). As such, the Court finds Mr. LaBarre's objection to the ALJ's reliance on Dr. Griffiths' and Dr. Gensemer's medical opinions on the basis that they were formulated during a brief period of improvement is meritless.

B.  WHETHER THE ALJ ERRED IN HIS ASSESSMENT OF MR. LABARRE'S CREDIBILITY

The entirety of Mr. LaBarre's objection to the ALJ's credibility assessment is as follows:

Because the ALJ offered the same inadequate reasons for finding Plaintiff not credible as he did for rejecting Dr. Gross' opinion, Plaintiff will not separately address that deficiency in the ALJ's decision (Tr. 32).

---

[5] On March 2, 2010, Dr. Gross assessed that Mr. LaBarre's GAF was between 50 and 60. (Admin. Tr. 419, Doc. 6-8, at 42).

(Doc. 9, at 22). In response, the Commissioner asserts that Mr. LaBarre's "bald assertion" that the ALJ's credibility assessment is deficient is without merit. She argues that the ALJ properly assessed Mr. LaBarre's credibility and discussed substantial evidence. (Doc. 14, at 29).

As an initial matter, the Court notes that the paucity of the briefing on this issue makes it difficult for this Court to conduct a meaningful review of Mr. LaBarre's argument. The Court construes Mr. LaBarre's one-sentence argument as an allegation that the ALJ's flawed evaluation of the medical opinion evidence undermined his assessment of Mr. LaBarre's credibility.

The Commissioner's regulations provide that:

> In evaluating the intensity and persistence of [a claimant's] symptoms, including pain, [the ALJ] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings and statements about how [the claimant's] symptoms affect [the claimant]. (Section 404.1527 explains how [the ALJ] consider[s] opinions of [the claimant's] treating source and other medical opinions on the existence and severity of [his or her] symptoms, such as pain.) [The ALJ] will then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work.

20 C.F.R. § 404.1529(a), 20 C.F.R § 416.929(a). "[T]he credibility of a claimant's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.[6] SSR 96-7p, 1996 WL 374186 at *4.

---

[6] A symptom is defined as "an individual's own description of his or her physical or mental impairment(s)." SSR 96-7p, 1996 WL 374186 at *2.

Because the Court has found that the ALJ's assessment of the medical opinion evidence of record was adequate, and his findings of fact were supported by medical evidence, the Court also finds that Mr. LaBarre's vague allegation that the ALJ's assessment of Mr. LaBarre's credibility was flawed due to an erroneous evaluation of the medical opinion evidence lacks merit.

**V.**   **CONCLUSION**

Based on the foregoing, the Commissioner's decision is **AFFIRMED**, and Mr. LaBarre's requests for relief are **DENIED**.

Dated: February 16, 2016                                      *s/ Karoline Mehalchick*

                                                                          **KAROLINE MEHALCHICK**
                                                                          **United States Magistrate Judge**